## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

|  |  |  |
|---|---|---|
| **KITISHA KIMBROUGH,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION** |
| **NANCY A. BERRYHILL,** | ) | **NO. 4:17-CV-01228-KOB** |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On May 7, 2014, the claimant, Kitisha Kimbrough, applied for disability insurance benefits under Title II of the Social Security Act. (R. 92). The claimant alleged disability beginning November 30, 2013, because of bipolar disorder, depression, obsessive compulsive disorder, asthma, COPD, low back pain, right knee pain, neck pain, and osteoarthritis. (R. 38). The Commissioner denied the claimant's application for disability insurance benefits on June 24, 2014. (R. 94-95). The claimant filed for a hearing before an Administrative Law Judge, and the ALJ held a hearing March 14, 2016. (R. 37).

On June 2, 2016, the ALJ denied the claimant's application, finding that the claimant was not disabled at any time during the relevant period and was, therefore, ineligible for social security benefits. (R. 30). The Appeals Council denied the claimant's request for review on May 19, 2017. (R. 1-3). Accordingly, the ALJ's decision is the final decision of the Commissioner of

the Social Security Administration. The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court REVERSES AND REMANDS the decision of the Commissioner.

## II.  ISSUE PRESENTED

Whether the ALJ properly considered the claimant's subjective testimony about the side effects of her medication?[1]

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

---

[1] The claimant raised various issues on appeal including (1) whether the ALJ accorded proper weight to the consultative opinion of Dr. David Wilson; (2) whether substantial evidence supports the ALJ's determination of the claimant's residual functional capacity; (3) whether the ALJ posed proper and complete hypothetical questions to the Vocational Expert; and (4) whether substantial evidence supports the ALJ's finding that the claimant did not meet Listing 12.04. This court will not address these issues and will reverse solely on the ALJ's failure to consider the side effects of the claimant's medication.

This court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

An ALJ considering a claimant's subjective testimony must first determine whether the claimant has "evidence of an underlying medical condition." *Holt v. Sullivan*, 921 F.2s 1221, 1223 (11th Cir. 1991); *see also* 20 C.F.R. § 404.1529. Once a claimant shows an underlying medical condition, she must show *either*: (1) "objective medical evidence that confirms the severity of the alleged pain arising from that condition," *or* (2) "that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the

alleged pain." *Holt*, 921 F.2d at 1223 (citing *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986)).

But, the ALJ must also consider symptoms without objective medical support if the claimant alleges these symptoms during the proceedings. 20 C.F.R. § 404.1529(c)(3). Specifically, the ALJ must consider the claimant's subjective testimony regarding the "effectiveness and side effects of any medications." *Walker v. Comm'r of Soc. Sec.*, 404 F. App'x 362, (11th Cir. 2010) (citing 20 C.F.R. §§ 404.1529(c)(3)(iv); 416.929(c)(3)(iv)). The ALJ fails to consider the side effects of medications when he does not (1) elicit testimony about the side effects and (2) make a finding about "the effect of…prescribed medications upon [the claimant's] ability to work." *Cowart v. Schweiker*, 662 F.2d 731, 737 (11th Cir. 1981).

If an ALJ discredits a claimant's subjective testimony, he must articulate his reasons and substantial evidence must support those reasons. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991).

## V. FACTS

The claimant was 39 years old at the time of the ALJ's final decision and a high school graduate. (R. 39-40). The claimant has past relevant work as a nurse assistant, housekeeper, cook, and phlebotomist, but has not engaged in substantial gainful activity since November of 2013. (R. 28). The claimant alleges disability beginning November 30, 2013, because of bipolar disorder, depression, obsessive compulsive disorder, asthma, COPD, low back pain, right knee pain, neck pain, and osteoarthritis

### *Physical and Mental Impairments*

On April 12, 2011, an ambulance crew transported the claimant to Gadsden Regional Medical Center from the scene of a car accident. (R. 559-63). The claimant complained of left

thumb pain, back pain, and knee pain. The emergency room physician, Dr. Stephen Jones, ordered X-rays of the claimant's hand, back, and knee that all showed "unremarkable" results. Dr. Jones prescribed Indocin and Robaxin for pain and discharged the claimant from the hospital. (R. 650-667).

The next day, on April 13, 2011, the claimant visited Roberta O. Watts Medical Center complaining of migraines that cause her to have blurred vision, nausea, and photophobia. The record lacks clarity whether this appointment was related to the April 12 accident. Dr. Ochuko Odjegba noted that the claimant had recurring issues with depression and migraines, prescribed Wellbutrin for depression and migraines, and discharged her. (R. 397-400).

Over the next five-months, the claimant visited Dr. Odjegba at Roberta O. Watts Medical Center seven times. At each visit, the claimant reported symptoms of lower back pain, left hand pain, or asthma. Dr. Odjegba ordered an X-ray of the claimant's back that showed only age related wear and tear. (R. 410). Dr. Odjegba diagnosed the claimant with Lumbago, scheduled an MRI, and prescribed the following medications: Medrol, Flexeril, Motrin, Tramadol, and Ibuprofen. (R. 405, 408, 415). To assist with the claimant's asthma, Dr. Odjegba prescribed Phenergan, Dulera, and Singulair. (R. 419, 423).

On October 19, 2011, the claimant visited Dr. Frank Hood at the Rainbow Family Medical Clinic upon referral from the Gadsden Regional Medical Center. The claimant reported that her back pain was no longer constant but that it bothered her when standing or engaging in sexual intercourse. Dr. Hood diagnosed the claimant with sciatic and somatic dysfunction of the L5 disc. (R. 567-69). The next day, October 20, the claimant returned to Dr. Hood complaining that her back pain had worsened and had begun radiating down her legs. Dr. Hood prescribed the claimant Vicodin for her pain. (R. 568-69).

On November 29, 2011, the claimant began visiting Dr. Royce Jones at the Jones Chiropractic Clinic. No doctor referred the claimant to Dr. Jones. (R. 571). The claimant complained of headaches and back, neck, and leg pain originating from her April 12 car accident. Dr. Jones performed several neurological, orthopedic, clinical, and X-ray examinations of the claimant for each of her complained of symptoms. Dr. Jones diagnosed the claimant with degenerative osteoarthritis; disc narrowing; lumbar sprain; cervical sprain; disc displacement; thoracic sprain; and disc space narrowing in several cervical vertebrae. (R. 582-84). Dr. Jones recommended a 12-visit schedule of therapy for the claimant's back. (R. 583).

The claimant returned to see Dr. Jones on January 12, 2012. At this visit, Dr. Jones noted that the claimant reported that 60% of her initial symptoms remained. Dr. Jones found no severe limitations from her back or neck pain and a 50% objective improvement. Dr. Jones recommended further appointments with a re-examination at the conclusion of the last appointment. (R. 587). On February 22, 2012, the claimant reported to Dr. Jones that 50% of her original symptoms remained. Dr. Jones found that the claimant had only mild restrictions from her pain and that most of her range-of-motion had returned with little to no pain. Dr. Jones recommended four more visits with a re-examination after the fourth visit. (R. 592-94).

The claimant returned to Roberta O. Watts Medical Center on March 6, 2012. Dr. James McCain examined the claimant for a reported Bakers cyst on her knee. Dr. McCain diagnosed the claimant with Bakers cysts and with symptoms of asthma. Dr. McCain prescribed the claimant Advair and Medrol for her asthma and referred the claimant to an orthopedist for her Bakers cysts. (R. 439-43).

The claimant returned to the Jones Chiropractic Clinic on April 2, 2012, for her re-examination. The claimant reported to Dr. Jones that 70% of her symptoms remained from her

initial visit. Dr. Jones, however, stated that "[o]bjectively, there has been an 85% improvement compared to the initial exam on 11/29/2011. Kitisha is released today from acute active care and placed on maintenance care…I recommend that Kitisha receive at least one treatment [per] month to maintain her present level of maximum medical improvement." (R. 597).

On October 2, 2012, the claimant visited Dr. Odjegba at Roberta O. Watts with complaints of back pain reported as 10/10 on the pain scale and asthma. Dr. Odjegba diagnosed the claimant with asthma, depression, and lumbago. He prescribed the claimant Advair for her asthma and Cymbalta for her depression. (R. 452-56). At the March 11, 2013, visit the claimant reported to Dr. Odjegba that the Cymbalta was not working and that she was still feeling irritable, aggressive, and anxious. Additionally, the claimant reported back pain and asthma. She stated that she had not been taking her medication for her asthma. Dr. Odjegba diagnosed the claimant with bipolar disorder, asthma, and lumbago. Dr. Odjegba referred the claimant to CED Mental Health Center for further evaluation of her bipolar disorder; explained that she needed to properly take her medication to reduce the symptoms from asthma; scheduled an MRI for her back pain; and continued her current prescriptions for lumbago. (R. 463-67).

On May 7, 2013, Dr. Ross Barnett performed an MRI on the plaintiff's lumbar spine. The MRI showed normal results for the majority of the claimant's lumbar discs. Dr. Barnett reported, however, that the claimant's L3-4 and L4-5 discs showed mild desiccation without a significant bulge, protrusion, or herniation. Dr. Barnett diagnosed the claimant with early desiccation, no significant disc bulge, and no other significant abnormality. (R. 688).

The claimant returned to see Dr. Odjegba on June 10, 2013, complaining of back pain and depression. Dr. Odjegba diagnosed the claimant with Cervicalgia and Lumbago. He referred the claimant to a neurologist for Cervicalgia and prescribed Soma for her back pain. (R. 468-72).

Upon Dr. Odjegba's referral, the claimant visited CED Mental Health Center on June 13, 2013. Ashley Bradford, a therapist, completed the claimant's intake paperwork. Ms. Bradford reported that she exhibited constant and persistent anger that forced her to stay in bed 4-5 days per week; paranoia and fear that someone was watching her; impulses related to anger; homicidal ideation toward her boyfriend; physical aggression toward her boyfriend; and feelings of hopelessness, worthlessness, and suicidal ideation. Ms. Bradford recommended individualized therapy and a medical assessment. (R. 386-90).

The claimant visited Ms. Bradford again on July 22, 2013. She reported nights where she cannot sleep and daily mood swings. Additionally, the claimant reported that she blocked her mother and sister out of her life because they were lecturing her to get out of bed. Ms. Bradford developed a treatment plan with the claimant, recommended relaxation exercises, and discussed better nutrition. (R. 690).

The claimant saw Dr. Richard Gant at CED Mental Health Center on August 13, 2013. Dr. Gant noted that the claimant suffered from bipolar disorder, depression, and had bouts of anger especially associated with her boyfriend. Additionally, the claimant had poor energy, motivation, insight, and judgment. Dr. Gant recommended that the claimant continue counseling at CED. (R. 691).

Over the next month, the claimant had several interactions with Ms. Bradford. On August 22, 2013, the claimant reported by phone that Depakote caused her to shake and itch very badly and that she did not sleep the past two days. (R. 692). At a September 10, 2013 appointment the claimant complained of mood swings, depression, perceptual disturbances, and anger at her ex-boyfriend. The claimant reported that her symptoms began after a car accident. (R. 694). On September 13, 2013, the claimant requested that she be placed on Klonopin to assist with both

her depression and inability to sleep at night. She told Ms. Bradford that her treating physician, Dr. Odjegba, would not prescribe Klonopin. (R. 698).

The claimant then visited Canterberry Family Practice Center because of an altercation with her boyfriend. The claimant had been struck in the face and complained of bruising and potential fractures. An X-ray came back negative. However, Cherie Keahey, CRNP, diagnosed the claimant with acute depression and provided a prescription for Paxil. (R. 478-82).

The claimant had another phone call with Ms. Bradford on September 25, 2013. She complained of irritability and of feeling "on edge." She claimed to have been taking Neruontin, Prozac, and Trazadone but that these medications were not working. Then, on October 2, 2013, the claimant complained to Ms. Bradford that the doctor continuously changed her medication. Ms. Bradford explained that, because the claimant kept complaining that her medication did not work, the doctor had to make changes to her medications. (R. 700).

On December 11, 2013, the claimant reported to Dr. Odjegba that her back pain had persisted and that she was, again, experiencing asthma symptoms. She also stated that she had not been taking her asthma medication. Dr. Odjegba told the claimant to take her asthma medication and prescribed Soma for her back pain. On January 6, 2014, the claimant reported to Dr. Odjegba that her back pain had worsened and that she had begun suffering from insomnia. Dr. Odjegba increased the dosage of Soma and prescribed Trazadone to assist with sleep. (R. 499-510). The claimant returned on January 14, 2014, claiming that the Trazadone had been ineffective in helping her sleep. Dr. Odjegba increased the dosage of Trazadone to 150mg. (R. 511-15).

On April 4, 2014, Ms. Bradford changed the claimant's case status to inactive after several no-shows for scheduled appointments. Ms. Bradford's discharge form reported the

claimant's diagnoses as bipolar disorder with psychosis; chronic arthritis; moderate stressors; poor attitude; poor insight; and anger issues. (R. 704).

The claimant returned to CED to see a new therapist, Laura Boley, on April 22, 2014. Ms. Boley's intake form reports that the claimant was staying away from her boyfriend and sought a better social life. Ms. Boley recommended individual therapy and a physician's assessment every six months. (R. 378-80). On May 19, 2014, Dr. Gant saw the claimant for her six-month follow-up. Dr. Gant noted that the claimant suffered from mood swings, anxiety, and insomnia. Dr. Gant recommended continued therapy and another follow-up appointment in six-months. (R. 382).

The claimant called Ms. Boley on May 22, 2014, with complaints of difficulty sleeping. The claimant called back on May 27, 2014, stating that she must take five Klonopin each night if she has any hope of getting any sleep. The claimant stated that some days she does not need to sleep, but also that she cannot sleep without at least five Klonopin. (R. 708).

On June 5, 2014, the claimant visited Dr. Fredric Feist at CED Mental Health Center. Dr. Feist noted that the claimant had a history of depression and bipolar disorder currently treated with Klonopin and Triloptol. Dr. Feist recommended continued counseling and a follow-up appointment in three-months. (R. 378).

On June 12, 2014, the claimant's friend, Adrienne Graves, submitted a third-party function report in support of her claim for disability. Ms. Graves reported that she has known the claimant for thirty-years and visits the claimant daily. Ms. Graves stated that the claimant spends her entire day in bed watching television. Ms. Graves also noted that the claimant sometimes needs reminders or help taking her medication, preparing meals, eating, and performing

household chores. Additionally, Ms. Graves reported that the claimant has a short temper and does not respond well to instruction. (R. 265-72).

At the request of the Social Security Administration, on June 23, 2014, Dr. Robert H. Heilpern performed a physical residual functional capacity assessment. Dr. Heilpern found that the claimant had exertional limitations such that she could occasionally lift a maximum of fifty pounds; stand for six hours of an eight hour day; push and pull with the extremities; and climb ladders, ropes, and scaffolds. Additionally, the claimant could frequently climb stairs, balance, stoop, kneel, crouch, and crawl. Dr. Heilpern also noted additional limitations related to the claimant's asthma. (R. 71-73).

Also at the request of the Social Security Administration, Dr. Lee Blackmon performed a mental RFC examination on June 23, 2014. Dr. Blackmon found that the claimant had understanding and memory limitations such that she was moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; work in coordination or in proximity to others; interact with the general public; complete a normal workday or workweek without interruptions; respond appropriately to criticism; respond appropriately to work changes; be aware of hazards; and set realistic goals. Dr. Blackmon also found that the claimant could understand and remember simple instructions and could attend to simple tasks for two-hours in an eight-hour day. The claimant's contact with the general public should be casual; criticism should be given in a non-confrontational manner; and changes to the work environment should be gradual and infrequent. (R. 73-75).

On June 27, 2014, the claimant visited Ms. Boley again and reported that her medication did not work but that she was unclear why the doctor kept changing her medications. Ms. Boley

recommended resumed use of Klonopin because the claimant did not have a history of drug abuse. (R. 713-14).

On August 19, 2014, the claimant visited Dr. Odjegba complaining of back pain and asthma. Dr. Odjegba prescribed Lyrica to assist with pain from Lumbago. Then, on September 16, 2014, the claimant began complaining of a Bakers cyst. Dr. Odjegba referred the claimant to Dr. Christopher Kelley, an orthopedist.

The claimant visited Dr. Kelley on September 18, 2014. Dr. Kelley ordered an X-ray of both of the claimant's knees and prescribed Norco for pain. On October 2, 2014, Dr. Kelley noted that the claimant did not have a medial meniscus tear, as feared, but recommended that treatment should proceed as if a tear existed. Dr. Kelley also noted a small Bakers cyst on the claimant's knee. (R. 759-62). Dr. Kelley gave the claimant a corticosteroid injection on February 19, 2015.

On July 8, 2015, the claimant visited the Crawford Clinic upon Dr. Odjegba's referral. The claimant complained of joint pain, swelling in her thumb and wrist, and ankle pain that worsens when she walks. Dr. Monica Crawford recommended that the claimant resume taking Ibuprofen and increased her Lyrica prescription to 150mg. Dr. Crawford also ordered X-rays of all of the claimant's joints that showed normal results with no acute bone issues. The X-rays of the claimant's knees showed mild degeneration of the knee joint. (R. 716-24).

On August 6, 2015, the claimant visited Dr. Odjegba complaining of back pain that is aggravated by standing and walking. Dr. Odjegba noted that the claimant's Lumbago was controlled and that she should continue taking her medication as directed. (R. 809-15).

The claimant returned to CED Mental Health Center on October 16, 2015, and performed another intake with therapist Aundrea Sway. Ms. Sway reported that the claimant could not get

out of bed, had no desire to do anything, and stayed indoors with the blinds closed. The claimant reported that she only gets up when everyone else in her house is asleep to avoid social interaction. Ms. Sway recommended continued therapy. (R. 732).

At the request of her attorney, the claimant visited Dr. David Wilson at Gadsden Psychological Services, LLC on November 18, 2015. The claimant discussed her medication side-effects noting that the Duloxetine she takes every morning makes her "loopy" and "zones [her] out." The claimant also reported to Dr. Wilson that she suffered from certain symptoms relating to obsessive compulsive disorder. Specifically, the claimant must drink her tea in exactly 92 seconds, she must have the lines on her carpet all go in one direction, and she must order her clothes by color. However, the claimant stated that these symptoms were controlled because she performed the vacuuming and laundry herself. The claimant could count down from twenty with no errors and from twenty-one by three with one error, and could do a simple math equation. The claimant could not perform a complex mathematical calculation and could not recall three items after ten-minutes. Dr. Wilson diagnosed the claimant with bipolar disorder, OCD, low intelligence, and back spasms. (R. 747-52).

The claimant visited Dr. Kelley again on November 12, 2015, because her knee pain had not improved. Dr. Kelley scheduled right knee arthroscopy surgery for December 11, 2015. (R. 824-27).[2] The claimant visited Dr. Kelley again on February 25, 2016, to reschedule her surgery for March 8, 2016. (R. 829-34).

Dr. Kelley performed the claimant's knee surgery on March 8, 2016, successfully stabilizing and debriding a small medial meniscus tear. Dr. Kelley recommended that the claimant limit her activity for two-days, prescribed Ancef for pain, and discharged her to home.

---

[2] For unknown reasons, no one performed this surgery at that time.

(R. 857-60). The claimant followed-up with Dr. Kelley on March 15, 2016, complaining of consistent pain. Dr. Kelley prescribed formal physical therapy and Norco for pain. (R. 923).

On April 15, 2016, the claimant visited Ms. Sway at CED Mental Health Center. The claimant noted that she takes her medication daily but continues to have difficulty with depression, anxiety, and sleep deprivation. (R. 932). On June 3, 2016, the claimant again visited with Ms. Sway. The claimant appeared agitated and upset because of legal issues with her ex-boyfriend. She reported continued difficulty with depression, anxiety, and insomnia. (R. 930).

On June 14, 2016, the claimant visited Dr. Feist at CED Mental Health Center complaining of depression and anxiety. Dr. Feist listed her current prescriptions as Paxil, Remron, Seroquel, and Trazadone. Dr. Feist recommended another follow-up appointment in three-months. (R. 929).

*The ALJ Hearing*

On March 14, 2016, the ALJ held a hearing at which the claimant and vocational expert Jewel Euto testified. The claimant testified that she had graduated from high school and had not worked since 2013 because she sleeps all day and is depressed. The claimant testified that she was involved in a car accident that caused her to have disc problems with her lower back. She stated that she needed to have surgery and suffers from early degenerative disc disease in the lumbar spine. She also noted that her current medications are Seroquel, Duloxetine, Soma, Singulair, Allegra, Albuterol, and Lyrica. (R. 41-42).

Next, the claimant testified that she has two children who live with her but no grandchildren. She stated that her children do not let her drive alone, especially after her recent knee surgery. The claimant noted that she does not cook at all and does not perform any housework because her children assist her. (R. 42-43).

The claimant then testified that Dr. Kelley prescribed her Percocet, Keflex, Vistaril, and Norco for pain in conjunction with her recent surgery. She stated that all of her combined medications, including Ibuprofen and allergy medicine, cause her to become sleepy after approximately thirty-minutes. When she begins to feel sleepy, the claimant testified that she is forced to sleep for four-hours at a time. She takes these medications three times a day. Despite the side-effect of sleepiness, the claimant testified that her doctors recommended continued use because she needed the medication. Additionally, the claimant testified that she was sleepy at the hearing because of her medication. (R. 44-45).

The claimant then testified that her back pain and neck pain prevent her from sitting in a chair for more than ten minutes at a time; lifting any item off of the floor; washing the dishes; or performing any housework that would require more than five to ten minutes of standing. Additionally, she testified that when she experiences this pain she must lie down but cannot watch a two-hour movie because her medication makes her drowsy. She also testified to a complete lack of appetite. (R. 45-48).

Even though she cannot stay awake during the day because of her medication, the claimant testified that she suffers from insomnia at night. She also testified that she experiences migraine headaches "every other day" but that her medication makes her sick and eats away at the acid in her stomach. She testified that strong smells and perfumes trigger her recurrent asthma attacks. (R. 48-51).

Next, the claimant testified about her recent surgery on her knee. At the time of her testimony, the claimant had yet to have her stitches removed and she was limited in mobility. The claimant testified that her knee was still bleeding and she was unsure if the surgery was performed properly. (R. 51).

The ALJ then posed several hypothetical questions to the vocational expert Dr. Euto. The ALJ asked Dr. Euto to assume a hypothetical individual with the same age, education, and past work as the claimant who could perform only light, unskilled work that did not require complex instructions. This person could not climb ropes, ladders, or scaffolds; work at unprotected heights with hazardous machinery; perform more than occasional stooping, crouching, crawling, or kneeling; breathe concentrated dusts, fumes, or other respiratory irritants; interact with coworkers and supervisors frequently; or have more than occasional contact with the general public. (R. 54).

The ALJ then asked whether a person with these limitations could perform the claimant's past work. Dr. Euto testified that the hypothetical person could not perform the claimant's past work but could perform light, unskilled work as an assembler, with 2,500 statewide jobs and 203,000 jobs in the national economy; an inspector/hand packager with 8,000 statewide jobs and 420,000 available jobs in the national economy; or a laundry folder with 10,000 statewide jobs and 305,000 available jobs nationally. (R. 54).

Next, the ALJ added further limitations to the hypothetical, specifically, the need to miss three or more days of work each month. Dr. Euto testified that an individual with these additional limitations could not perform any work because of excessive absenteeism. The ALJ then referred back to his first hypothetical but added a limitation of the need to be off-task for up to 20% of an eight-hour day. Dr. Euto testified that such an individual could not perform any work because she would excessively be off-task. (R. 55).

*The ALJ Decision*

On June 2, 2016, the ALJ found that the claimant was not disabled, within the meaning of the Social Security Act, from November 30, 2013 through the date of his decision. The ALJ also

found that the claimant had not engaged in substantial gainful activity during the claimed disability period. (R. 17-19).

The ALJ then stated that the claimant had the following severe impairments: osteoarthritis, degenerative disc disease, obesity, a history of meniscus tears, bipolar disorder and moderate kidney disease.[3] The ALJ found that the claimant's alleged left knee cyst, asthma, and obsessive compulsive disorder were not severe because they only minimally restrict the claimant's ability to perform basic work activity. Specifically, the ALJ noted that the claimant's left knee cyst showed no current symptoms following treatment; her asthma was moderate and uncomplicated; and her OCD symptoms were maintained and "not a problem for her." (R. 20).

The ALJ then found that the claimant's severe impairments or combination of impairments did not meet the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Specifically, the ALJ noted that claimant's osteoarthritis and history of meniscus tears did not evidence difficulty ambulating, cause major dysfunction in a weight bearing joint, or require assistive devices; her recent knee surgery did not prevent her from ambulating regularly and required only two-days of limited activity; her degenerative disc disease did not evidence an inability to ambulate effectively because her MRI was unremarkable and her pain medication helped enormously; objective medical evidence did not support her chronic kidney disease; and her obesity did not significantly impair her ability to ambulate. (R. 21-22).

The ALJ then looked to the claimant's mental impairments, both individually and in combination with her physical impairments, and found that her mental impairments also did not meet the severity of any listing. Specifically, the ALJ noted that the claimant did not evidence two or more marked restrictions or repeated episodes of decompensation. (R. 22-23).

---

[3] The court is uncertain why the ALJ listed chronic kidney disease as a severe impairment. The claimant did not raise kidney disease in her briefs and the medical record does not support any finding of kidney malfunction or disease.

The ALJ stated that the claimant had only moderate restrictions in her daily living. The ALJ found that the claimant could perform personal hygiene; drive; shop for necessities; and prepare simple meals. Additionally, the ALJ noted that the claimant could clean her house, iron her clothes, and do the laundry. The ALJ relied on testimony of the claimant's "life-long friend who sees her daily" to help support these activities. (R. 22).

The ALJ next found that the claimant had moderate difficulty in social settings. The ALJ referred to testimony from the claimant that she had difficulty getting along with others, going out in public, and had been fired for bad attitude. But, the ALJ also noted that the claimant could cooperate and communicate effectively with the interviewers at the hearing and had a proper rate of speech. (R. 23).

The ALJ then found that the claimant experienced moderate difficulty with concentration, persistence, and pace. Specifically, the ALJ stated that, although the claimant struggles to focus for more than one-hour, experiences stress and anxiety when changes occur, and needs to take a nap during the day, the claimant also demonstrated intact memory and thought content. (R. 22). Additionally, the ALJ stated that the claimant had presented no evidence of episodes of decompensation. Thus, because the claimant's physical and mental impairments did not meet a severity listing, the ALJ next determined the claimant's residual functional capacity. (R. 23).

The ALJ determined that the claimant had the residual functional capacity to perform unskilled, light work as defined in 20 C.F.R. §§ 404.1567(b); 416.967(b), such that the claimant could not handle complex instructions or procedures; climb ropes, ladders, or scaffolds; work at unprotected heights with hazardous machinery; perform more than occasional stooping, crouching, crawling, or kneeling; breathe concentrated dusts, fumes, or other respiratory irritants;

interact with coworkers and supervisors frequently; or have more than occasional contact with the general public. (R.23).

To support this finding, the ALJ considered the claimant's medical and non-medical record. Specifically, the ALJ noted that the claimant testified that she could not stand in one place or sit in a hard chair for more than ten-minutes; walk for more than one half-mile before needing a thirty-minute rest; or lift anything because of her back and neck pain. The ALJ also noted that the claimant testified that she cannot stay awake during the day or sleep at night because her medication makes her fall asleep within thirty-minutes for four hours at a time, forcing her to sleep throughout the day. Additionally, the ALJ noted that the claimant admitted that she cannot get along with others, does not handle stress or change well, and has occasional headaches that are cured with medication. But, the ALJ noted that the claimant watched television daily, talked on the phone with other people, and regularly attended church. (R. 24).

The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause the complained of symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects were not consistent with the evidence. (R. 24).

The ALJ first discussed the claimant's alleged physical impairments. Specifically, the ALJ noted that MRI's of the claimant's back showed no significant disc bulge, protrusion, herniation, or other abnormality. Further, the ALJ found that X-rays of her joints showed no more than mild degeneration of the soft tissue. The ALJ noted that the claimant testified that pain medication helps "tremendously" with her joint and back pain. (R. 25). The ALJ then found that a meniscus tear in her right knee likely caused the claimant's knee pain, but her recent surgery remedied this tear. (R. 25).

Discussing the claimant's chronic kidney disease, the ALJ noted that the record contains no indication of kidney disease until her May 8, 2016 knee surgery. The ALJ noted that before surgery Dr. Kelley recorded a heightened Glomerular Filtration Rate (GFR), but otherwise the claimant had normal kidney function that would not prevent performing basic work functions. Additionally, the ALJ noted that the claimant did not allege limitations because of obesity, but that while her weight may exacerbate other impairments, it did not cause limitations other than those already described. (R. 25).

The ALJ then discussed the claimant's health impairments. The ALJ noted that the claimant had multiple no-shows for appointments; a history of substance abuse with prescribed medication; and a long gap in treatment between 2013 and 2015. After this gap, the ALJ noted that the claimant was diagnosed with major depressive disorder and bipolar disorder without suicidal or homicidal thoughts. But, the ALJ noted that the objective medical evidence and other evidence in the record did not support the claimant's alleged severity of her mental impairments. (R. 25-26).

The ALJ noted that the claimant acknowledged her ability to perform daily activities like personal care, preparing meals, shopping in stores, and doing the laundry and cleaning. The ALJ found that these activities were inconsistent with a claim of disability. Additionally, the ALJ found that the claimant had a history of noncompliance with medications and missed several appointments with mental health providers. Regarding the claimant's testimony that she must stay in bed for four to five days a week, the ALJ noted that this limitation was inconsistent with her testimony that she attends church every week. (R. 26).

The ALJ gave little weight to the consultative opinion of Dr. David Wilson. The ALJ noted that Dr. Wilson reported that the claimant would be highly impaired when withstanding

the daily pressures of a job and would have difficulty relating to others at work. Additionally, the ALJ noted that Dr. Wilson reported that she could remember and carry out simple instructions, but that she would miss twenty-five days of work out of a thirty-day period because of her psychological impairments. But, the ALJ noted that Dr. Wilson relied almost exclusively on the claimant's own reporting and that Dr. Wilson performed almost no objective testing. Thus, the ALJ found that Dr. Wilson's report lacked substantial support. (R. 26).

The ALJ gave good weight to the state agency's consultative experts because substantial medical evidence supported their opinions. The ALJ noted that Dr. Heilpern performed an objective medical examination and found that the claimant could perform medium exertional work. Despite this finding, the ALJ limited the claimant to light work because her testimony and additional evidence that occurred after the rendering of this consultative opinion supported this limitation. (R. 26-27). Additionally, the ALJ gave significant weight to the state agency's consultative psychologist, Dr. Bradford. The ALJ noted that Dr. Bradford also performed a thorough, objective examination and the record supported her opinion. (R. 27).

The ALJ gave some weight to Ms. Graves' third-party function report. The ALJ noted that Ms. Graves had known the claimant for thirty-years and visited the claimant daily. However, the ALJ also noted that Ms. Graves' opinion was not neutral and that she is not a medical professional. Thus, because the objective medical evidence does not fully support her opinion, the ALJ gave the opinion some weight. (R. 27-28).

The ALJ found that the claimant could not perform her past work as a nurse assistant, housekeeper, cook, or phlebotomist. The ALJ then discussed the claimant's RFC and determined that a significant number of jobs exist in the national economy that the claimant would be able to perform. The ALJ relied on the vocational expert's testimony that, given the claimant's credible

and supported limitations, she could perform light work such as an assembler, inspector, or laundry folder. Thus, the ALJ found that the claimant was not disabled. (R. 28-30).

## VI. DISCUSSION

The claimant argues that the ALJ erred by failing to make a finding or articulating his reasons for discrediting the claimant's subjective testimony about the side effects of her medications. This court agrees.

The claimant testified at her hearing that she was taking Seroquel, Duloxetine, Singulair, Allegra, Albuterol, Lyrica, Ibuprofen (800mg), Percocet, Keflex, Vistaril, and Norco. (R. 42-44). She stated that the combination of these medications caused her to go to sleep after "30 minutes or less" and that once asleep, she needs to sleep for four hours at a time. She takes these medications three times a day. (R. 45).

Even though a claimant's testimony "might be exaggerated," an administrative law judge must, at the very least, make "a finding on appellant's claim regarding side effects, making it possible for a reviewing tribunal to know that the claim was not entirely ignored." *Cowart*, 662 F.2d at 737 (quoting *Figueroa v. Secretary of HEW*, 585 F.2d 551, 554 (1st Cir. 1978). In *Cowart*, the claimant testified that her medication caused her to be "kind of zonked most of the time." *Cowart*, 662 F.2d at 737. The Eleventh Circuit held that it was "conceivable that the side effects of medication could render a claimant disabled or at least contribute to a disability." *Id.* But, the ALJ's failure to make any findings regarding the claimant's testimony was reversible error. *See Id.*

Similarly, the ALJ here did not make any findings about the claimant's testimony concerning the side effects of her medication. The ALJ acknowledged that the claimant had testified that the medications made her sleep after 30 minutes for four hours at a time, but never

mentioned these side effects again. (R. 24). The ALJ only discussed the claimant's sleep habits one other time, stating that "while the claimant reported that she stayed in bed all day 4-5 days per week, she also reported going to church every week regularly." (R. 26). This reference to staying in bed 4-5 days a week originated from the claimant's medical records relating to her depression, paranoia, and anger, not from the side effects of her medication. (R. 386). Additionally, attending church one-day per week is not inconsistent with the claimant's testimony about her side effects or with her statement that she must stay in bed 4-5 days per week. The ALJ has not convinced this reviewing court that the claimant's subjective testimony about the effects of her medications was anything but "entirely ignored." *See Cowart*, 662 F.2d at 737.

Thus, this court reverses and remands because the ALJ failed to make a finding or properly articulate his reasons for discrediting the claimant's subjective testimony about the side effects of her medication. *See Brown*, 921 F.2d at 126.

## VII.   CONCLUSION

For the foregoing reasons, the court concludes that the ALJ failed to articulate substantially supported reasons for discrediting the claimant's subjective testimony. The decision of the Commissioner should be REVERSED AND REMANDED.

The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 21st day of March, 2019.


*Karon O. Bowdre*
_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE